# ORIGINAL
## Transcript of the Testimony of

## **Nicole Ducharme**

January 22, 2019

Nicole Ducharme v. Mary Salzer, Crescent City Deja Vu, L.L.C., Does 1-10, ABC Insurance Companies 1-10





COURT REPORTING & LITIGATION SUPPORT

P.O. Box 1554 · Hammond · Louisiana 70404
**(Toll Free) 866.870.7233 · 985.542.8685 · (Fax) 985.419.0799**
office@amersonwhite.com · www.amersonwhite.com

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

NICOLE DUCHARME )
)
VERSUS )NO. 18-cv-04484-LMA-JVM
)
CRESCENT CITY DEJA VU, )
LLC, MARY SALZER, DOES )
1-10, AND ABC INSURANCE )
COMPANIES 1-10 )

DEPOSITION OF NICOLE DUCHARME
TAKEN AT STIEGLER LAW FIRM LLC
318 HARRISON AVENUE, SUITE 104
NEW ORLEANS, LA 70124
ON TUESDAY, JANUARY 22, 2019 AT 11:05 A.M.

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

Nicole Ducharme 1/22/2019

```
 1          Q.    What were you doing for Hard Rock?
 2          A.    Well, first I was a server, then I was a
 3    bartender, then I was a supervisor, then I was a
 4    corporate trainer.
 5          Q.    Was that all in New Orleans, or was that
 6    at various --
 7          A.    No.   I opened a few.   It was at various
 8    Hard Rocks; one in Key West, Florida; San Antonio,
 9    Texas; and Hollywood, California; and also in New
10    Orleans.
11          Q.    So that's from 2005 until about 2012?
12          A.    2012, December of 2012.
13          Q.    So what happened in 2012, why did you
14    leave Hard Rock?
15          A.    They moved to Bourbon Street, and I didn't
16    want to work on Bourbon Street.
17          Q.    Why is that?
18          A.    Because I was too old to work on Bourbon
19    Street, I guess.   I don't know.   It was trashy,
20    several reasons.
21          Q.    So where did you go after you left Hard
22    Rock?
23          A.    Let's see.   2012, I moved to Key West, and
24    I was operations manager at a place called Fogarty's
25    on Duval Street.
```



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

Nicole Ducharme 1/22/2019

```
 1    That's the position I was getting hired for.
 2         Q.    So the Craigslist ad specifically said
 3    server?
 4         A.    Correct.
 5         Q.    Were you hired that day on the spot?
 6         A.    I think she called me a little while after
 7    I left.
 8         Q.    A couple of days?
 9         A.    No.  Like, a few hours.
10         Q.    Oh, I see.
11         A.    Yes.
12         Q.    So you started March 2016, as a server.
13    For about how long did you work as a server?
14         A.    I think about 9 months.
15         Q.    And had you wanted to move to the
16    bartender position?
17         A.    Yes.
18         Q.    And why was that?
19         A.    Because it's more fun.
20         Q.    Okay.  And as a server, you were paid 2.50
21    an hour, correct?
22         A.    I think it was 2.13, plus tips, I think.
23         Q.    As a bartender, how were you paid?
24         A.    Shift pay.
25         Q.    What does that mean?
```



```
 1          A.    Mary.
 2          Q.    So how did she try to force you?
 3          A.    Well, it's against the law to tip out the
 4    kitchen.  Then, if we didn't tip them out, the
 5    kitchen would be bullies or run long ticket times or
 6    don't make our food or et cetera.
 7          Q.    So how did she try and force you to tip
 8    out the kitchen?
 9          A.    Because she told us to tip out the
10    kitchen.  It's against the law.  That's forcing.
11          Q.    When did she tell you that?
12          A.    When I started working, I had to tip out
13    the kitchen.
14          Q.    Did you tip out the kitchen?
15          A.    Yes.
16          Q.    How?
17          A.    Cash.
18          Q.    How much did you tip them out?
19          A.    It depends on how much I made, how busy
20    the day was, how well they did.
21          Q.    Was there a percentage that you would tip
22    them out?
23          A.    No.
24          Q.    Did Mary tell you how much to tip them
25    out?
```



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond, LA 70404    Fax 985.419.0799

Nicole Ducharme 1/22/2019

1          A.    No.

2          Q.    Did she ever do this in writing?

3          A.    No.

4          Q.    Did she ever tell anyone else that they

5     had to tip out the kitchen?

6          A.    Everybody.

7          Q.    Who?

8          A.    The people that worked there.

9          Q.    What were their names?

10         A.    Let's see.  You want me to name everybody?

11    Marshall Rudd.

12         Q.    She told Marshall to tip out the kitchen?

13         A.    Yes.  Boone Marchand; Cindy Anderson;

14    Kelsy O'Morrow; Alicia Barlow; Derrick Brumfield;

15    Johnny, I don't remember his last name.  I mean, the

16    people that worked there.

17         Q.    Those were all servers?

18         A.    Both; bartenders and servers.

19         Q.    Bartenders and servers.  So what was the

20    process for you tipping out the kitchen?

21         A.    Just go back there and hand them cash.

22         Q.    Would you hand it to one specific person?

23         A.    No.  Give it to each individual person

24    that was working; two cooks and a dishwasher some

25    days.



Nicole Ducharme 1/22/2019

1       Q.    What are the names of the people who you
2   gave the cash to?
3       A.    Terrel, I don't remember his last name.  I
4   know that there was a -- I mean, this has been a
5   while.  I can't remember everybody's name that
6   worked there in the kitchen, of course.  Rodney, I
7   know, was somebody that worked there.  Big Willie
8   was one.  Yes.
9       Q.    So the three you remember were Terrel,
10  Rodney and Willie?
11      A.    And then there was another boy, I can't
12  remember his name, though.  He worked in the
13  daytimes cooking.  I don't remember his name.
14      Q.    Did you tip them out every day?
15      A.    No.
16      Q.    How often did you tip them out?
17      A.    Maybe twice a week.
18      Q.    How did you decide whether or not to tip
19  them out?
20      A.    How much money I made.
21      Q.    If you made above a certain amount, you
22  would give them money?
23      A.    Correct, how busy it was, how good of a
24  job they did.
25      Q.    Did Mary ever come to you and tell you,

```
 1     hey, you forgot to tip them out today, or go give
 2     them tip out?
 3          A.   No, but Johnny, the manager, would always
 4     have something snarky to say about it if we weren't
 5     tipping them out.
 6          Q.   So Johnny told you to tip people out?
 7          A.   Correct.
 8          Q.   You think Johnny was the manager?
 9          A.   That's what I was told.
10          Q.   What about Eric, was he a manager?
11          A.   He was the bar manager.
12          Q.   Did Eric ever tell you to tip anybody out?
13          A.   No.  Eric really didn't do anything.
14          Q.   So do you know whether Marshall actually
15     did tip out?
16          A.   Yes, I know that he did.
17          Q.   Do you know whether Kelsy actually tipped
18     out the back?
19          A.   Yes, I do.
20          Q.   And Alicia?
21          A.   Yes.
22          Q.   Did they complain to you about it?
23          A.   Sometimes.
24          Q.   Did you ever complain to them about it?
25          A.   Probably.
```



Nicole Ducharme 1/22/2019

Page 40

```
 1          Q.    Did you ever bring it up to Mary?
 2          A.    No.
 3          Q.    Did you ever tell her that you thought it
 4    was illegal?
 5          A.    I know it was illegal.  I don't think it.
 6          Q.    The question was whether you told Mary
 7    that?
 8          A.    No.
 9          Q.    Did you ever tell Johnny or Eric?
10          A.    Probably.
11          Q.    Do you recall telling Johnny or Eric?
12          A.    I wouldn't have told Eric, because he was
13    useless, but Johnny, probably, yes.  I can't
14    remember now.
15          Q.    So you don't have any specific memory of
16    telling him or not?
17          A.    No.
18          Q.    How much would you estimate that you paid
19    to the back of the house people an average week?
20          A.    About, maybe, $50.
21          Q.    Did you ever track it?
22          A.    No.
23          Q.    Did you pay it out of the cash tips you
24    had received that day?
25          A.    Correct.
```



Nicole Ducharme 1/22/2019

Page 41

1      Q.   Okay.  So you wouldn't have any written
2  records of anything?
3      A.   No.  I don't care.  It's only money, you
4  know.  I make some more tomorrow.  So I don't really
5  keep track.
6      Q.   And what about when you were a bartender,
7  were you still tipping people out?
8      A.   Correct.
9      Q.   Okay.  Did anything change when you
10 switched from server to bartender in terms of the
11 tip pool?
12     A.   No.
13     Q.   Did you tip pool among servers or among
14 bartenders?
15     A.   No.  Only when, if you, like, worked with
16 another bartender, I guess you would share tips, but
17 I never did, so...
18     Q.   Do you know how much the back of the house
19 people would make?
20     A.   No.  I assume probably pretty low.  $10 an
21 hour, maybe.
22     Q.   You don't know, though?
23     A.   I have no idea.
24     Q.   Let's talk a little bit about what your
25 duties were during your bartending shifts.  Okay.  I


AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond, LA  70404    Fax 985.419.0799

Nicole Ducharme 1/22/2019

Page 42

1    assume most of your time is spent making drinks,
2    taking orders, making drinks, correct?
3         A.    Correct.
4         Q.    Do you serve food at the bar?
5         A.    Yes.
6         Q.    How frequently?
7         A.    Pretty often.
8         Q.    Would you have an idea of what the split
9    was in terms of your sales; how much was food, how
10   much was drinks?
11        A.    Yes.  I would say the majority was drinks.
12        Q.    Okay.  Majority, like, 60 percent or,
13   like, 95 percent, you know?
14        A.    60 is good.
15        Q.    Okay.  Or any number in between?  I'm just
16   trying to get a feel.
17        A.    No.  People came and did takeout orders
18   and stuff, too.
19        Q.    So you handled takeout orders at the bar?
20        A.    Correct.
21        Q.    Other than serving food and serving
22   drinks, what duties did you have as a bartender?
23        A.    Keeping the bar stocked and cleaned, also,
24   like, taking in, like, liquor orders, signing for
25   them, writing checks to purveyors.



```
 1          Q.    You had authority to write checks for
 2    Crescent City Deja Vu?
 3          A.    Well, yes, just the number.  I mean, they
 4    were already signed and stuff, but just to whoever.
 5    Say, like, the beer guy came in, dropped off beer,
 6    we would have checks that Mary would bring, and we'd
 7    give them out, just write in the number, whatever we
 8    owed them.
 9          Q.    So Mary would write out the check and sign
10    it, and then you would just give it to the beer guy?
11          A.    I would have to write the number, like,
12    the correct amount on it that the purveyor needed.
13          Q.    How often did beer deliveries come in?
14          A.    Maybe twice a week.
15          Q.    Any other deliveries that you would take?
16          A.    Liquor.
17          Q.    How often would that come in?
18          A.    The same; twice a week, maybe once.  I
19    don't recall.
20          Q.    Was Mary ever there to take those
21    deliveries or write those checks?
22          A.    Yes.
23          Q.    So you'd only do this when she wasn't in
24    for some reason?
25          A.    Yes, or if she was up in the office or
```



Nicole Ducharme 1/22/2019

Page 44

1    when she needed us to.

2         Q.   In terms of keeping the bar stocked, what

3    did that entail?

4         A.   Replacing what you used during the shift.

5         Q.   So is there a cooler somewhere with beer

6    in it?

7         A.   Yes, making sure that's stocked, making

8    sure --

9         Q.   How long did that take?

10        A.   -- that liquor is stocked.

11             I don't know.  Do it throughout the day.

12   Not long.

13        Q.   Okay.  So other than the stocking and then

14   taking these orders when they come in, anything else

15   that was -- any other duties that you had?

16        A.   No.  Just the poker payouts and stuff,

17   poker, yes.

18        Q.   I'm sorry, what?

19        A.   Poker payouts, keeping in charge of the

20   poker money.

21        Q.   Did you ever order supplies or beer

22   yourself?

23        A.   No.

24        Q.   Did others help you stock, servers, people

25   like that?



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1        A.    Yes.
 2        Q.    Who?
 3        A.    I don't remember his name.  Tall, thin,
 4   light-skinned kid.  I don't know.  Maybe began with
 5   a D.  I can't remember everybody's name.
 6        Q.    Do you remember what he said?
 7        A.    Yes.  He had his hand out, and he expected
 8   to get tipped, because everybody else did it.
 9   Johnny liked to make people feel guilty if they
10   didn't tip out the kitchen.
11        Q.    Did Johnny work the same shift as you did?
12        A.    No.
13        Q.    When did Johnny work?
14        A.    Usually 4 to midnights.
15        Q.    Was he a bartender?
16        A.    No.  He was a server.  He bartended
17   occasionally.
18        Q.    So what do you mean by Johnny tried to
19   make people feel guilty; what did he say?
20        A.    I don't know.  He asked us if we tipped
21   out the kitchen or why we didn't tip out the
22   kitchen.  He would always tip them exorbitantly, so
23   make us feel bad.
24        Q.    How much did he tip them?
25        A.    I don't know.  I saw him hand them 20s a
```

```
 1    couple of times.
 2         Q.   So you think it was Johnny, then, who told
 3    you to tip out the kitchen?
 4         A.   No.  Pretty sure that Mary told me to tip
 5    out the kitchen.
 6         Q.   Just a moment ago, you said Johnny tried
 7    to make you feel guilty.
 8         A.   Right.
 9         Q.   So when did Mary say something to you?
10         A.   Probably within the first week I worked
11    there.
12         Q.   What did she say?
13         A.   She said it's customary to tip out the
14    kitchen.
15         Q.   Did she come down to you while you were
16    bartending and tell you that?
17         A.   No, because I didn't start out as a
18    bartender.  I was a server first.
19         Q.   Fair enough.  So where did the
20    conversation take place?
21         A.   Probably on the floor.
22         Q.   How did you respond to that?
23         A.   I said, okay, because I was new at the
24    job.
25         Q.   At the time, were you aware of minimum
```



Nicole Ducharme 1/22/2019

```
 1     That's all I recall.
 2          Q.   Did you ever drink when you were on the
 3     job?
 4          A.   Sometimes.
 5          Q.   How often?
 6          A.   Rarely.
 7          Q.   Once a week?
 8          A.   No.  Less.
 9          Q.   Once a month?
10          A.   Yes.
11          Q.   Would it vary?
12          A.   Right.
13          Q.   You knew there was a rule against drinking
14     on the job, right?
15          A.   Yes, I guess, but everybody did it, so...
16          Q.   Did Mary know you were drinking on the
17     job?
18          A.   I don't know.  Probably.  There's cameras
19     everywhere.
20          Q.   Do you think she's watching the cameras
21     24/7?
22          A.   Yes, I do.
23          Q.   Why do you think that?
24          A.   Because she would call in the middle of
25     the night with weird stuff like that.  She
```



Nicole Ducharme 1/22/2019

```
 1          Q.    You understand that you were a tipped
 2   employee at the time?
 3          A.    Right.
 4          Q.    Okay.  You said earlier that you
 5   understood minimum wage laws, because you were a
 6   manager previously?
 7          A.    Yes.  I am a manager now.
 8          Q.    All right.  Turn to page 16, please.  I'm
 9   not going to go through the whole handbook.
10          A.    (WITNESS COMPLIES).
11          Q.    You see here that it talks about reporting
12   cash and credit card tips; is that right?
13          A.    Uh-huh (AFFIRMATIVE RESPONSE).
14          Q.    Turn to page 18.
15          A.    (WITNESS COMPLIES).
16          Q.    Okay.  And you see here there's an
17   employee meal and drink policy?
18          A.    Yes.
19          Q.    Take a second to read it.  Is that your
20   understanding of what the policy was when you were
21   there?
22          A.    Yes.  That's what I told you earlier.
23          Q.    Is there a wall in the back of the
24   restaurant where posters and notices were hanged?
25          A.    No.  There's not really a wall in the back
```



```
 1    of the restaurant.  It's got, like, shelving and
 2    places where the coffee machine is, the POS system,
 3    the ice machine, a little cooler, but there's
 4    like --
 5        Q.   There's -- I'm sorry.  Go on.
 6        A.   There's, like, a board where you write 86
 7    stuff or stuff that needs to be ordered.
 8        Q.   Is that near the employee bathroom?
 9        A.   No.  The employee bathroom is upstairs.
10        Q.   Okay.  So upstairs near the employee
11    bathroom, is there a wall?
12        A.   Yes.  Like, about federal laws about,
13    like, you know, federal minimum wage and stuff like
14    that.
15        Q.   Okay.  You would be in that area; you've
16    seen that area before?
17        A.   Uh-huh (AFFIRMATIVE RESPONSE).
18             MR. STIEGLER:  Mark this as Exhibit 3,
19             please.
20             (EXHIBIT 3 MARKED FOR IDENTIFICATION)
21    EXAMINATION BY MR. STIEGLER:
22        Q.   Does this look like a picture of that wall
23    to you?
24        A.   Yes, I think so.
25        Q.   Okay.  So let's talk about the events
```



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

Nicole Ducharme 1/22/2019

Page 77

```
 1          A.    A couple of days later.

 2          Q.    Was that on September 5th, that she told

 3    you she wouldn't give you a ride?

 4          A.    No.  I had asked her about a week before.

 5    So a few days later, I told her that I was pregnant,

 6    and that I was going to have the procedure.  And

 7    then I asked her if she could still give me a ride,

 8    and she said, no.

 9          Q.    Did you ask her why not?

10          A.    No.

11          Q.    Did she tell you why not?

12          A.    No.

13          Q.    Did she try and talk you out of it?

14          A.    No.

15          Q.    The abortion, I mean?

16          A.    No, not that I recall.

17          Q.    Did she say anything that led you to think

18    she disapproved?

19          A.    She didn't have to say anything.  Her

20    attitude changed.

21          Q.    So she didn't say anything that led you to

22    believe she disapproved?

23          A.    Not that I recall.

24          Q.    What do you mean when you say her attitude

25    changed?
```



Nicole Ducharme 1/22/2019

Page 78

1          A.    I mean, you have to know her personally.
2     You know what I mean?  Her whole demeanor was
3     standoff-ish.
4          Q.    Can you give a specific example of what
5     she did that was standoff-ish?
6          A.    Yes.  She started treating me crappily.
7          Q.    What are some ways that she started
8     treating you crappily?
9          A.    Well, she would talk to me not very
10    nicely, avoid me.  We used to be close, and it hurt
11    my feelings.  She started treating me indifferently.
12         Q.    And this all happened within the space of
13    a day or two?
14         A.    No.  It was about a week or so.
15         Q.    About a week?
16         A.    Yes.
17         Q.    Your last day of work was September 7th,
18    right?
19         A.    Correct, the same day that I had the
20    procedure.
21         Q.    So your last day of work was
22    September 7th.  I'm trying to nail down this
23    timeline, because it's jumped around a little bit.
24    So you said --
25         A.    I stated specifically that I asked her a



Nicole Ducharme 1/22/2019

Page 79

1    week before for a ride.
2         Q.    For September 5th?
3         A.    Correct.
4         Q.    Right.
5         A.    So how is it jumping around?
6         Q.    Then a couple of days later, you told her
7    the reason for the ride?
8         A.    Correct.
9         Q.    And that would have been about, like,
10   September 3rd?
11        A.    Well, I mean, if it was a week before,
12   right, so say, I think it was on a Monday, right,
13   the week before that.  So then the appointment was
14   on the Tuesday of the next week, right.  So then it
15   was, I don't know, maybe that Wednesday.  I mean, a
16   few days before.  I don't know, maybe about 5 days
17   before.  I told her on a Monday.  It was a week
18   before I needed the ride, a week and one day.
19        Q.    Would it help if I got a calendar from
20   September 2017?
21        A.    Oh, for fuck sake.
22              Yes, probably.  You need the exact date,
23   is what you're asking me?
24        Q.    If you can provide it.
25        A.    It doesn't go back, huh?  Here we go.



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

Nicole Ducharme 1/22/2019

```
 1              August 28th.
 2        Q.    That would have been the day you first
 3    asked her?
 4        A.    Correct.
 5        Q.    Do you remember what would have been the
 6    day that she said, no, that she wasn't going to give
 7    you a ride?
 8        A.    Probably on the 31st.
 9        Q.    Why did you decide to tell her the reason
10    for your appointment?
11        A.    Because we were close, and I told her
12    everything, because I loved her.
13              MR. RHODES:  Do you need a minute?
14              THE WITNESS:  I thought she loved me too.
15              No, I don't.  I'm sorry
16    EXAMINATION BY MR. STIEGLER:
17        Q.    If you need a minute, it's fine.
18        A.    I don't.  I'm okay.  It's fine.
19        Q.    Before that conversation, had she given
20    you any reason to believe that she was going to
21    disapprove or a reason to expect that she would
22    disapprove of the abortion?
23        A.    No.
24        Q.    Did you ever hear her say anything that
25    was political about abortion?
```



Nicole Ducharme 1/22/2019

Page 81

```
 1        A.    No, but she fired another employee a week
 2   later that had an abortion.
 3        Q.    We'll get to that, though.  It's not the
 4   question.  The question was:  Have you ever heard
 5   Mary say anything political about abortion?
 6        A.    No, but we didn't talk about it until it
 7   came up.
 8        Q.    Did you ever know Mary to be religious?
 9        A.    Not specifically, no.
10        Q.    Did she ever say anything to you at all
11   about religion?
12        A.    I mean, I don't recall that.  I don't
13   know.
14        Q.    At some point, you told her you would need
15   a couple of days off for the procedure?
16        A.    Yes, just two days off.
17        Q.    Okay.  That would have been September --
18        A.    September 5th and September 7th.
19        Q.    What did she tell you?
20        A.    She said, okay.
21        Q.    So there was no, like, recuperating time
22   after that?
23        A.    No.  I was afraid to take time off,
24   because everybody that ever took time off got fired.
25        Q.    If you carried the baby to term, you would
```



Nicole Ducharme 1/22/2019

Page 84

1        A.    I guess around the same time I found out.
2   But she had told me, probably a month before, that
3   she was afraid because she had missed her period.
4        Q.    Did she tell Mary that, as well?
5        A.    No, I don't think so.  Did I tell Mary
6   that, or did she?
7        Q.    Well, A, did you tell Mary that?
8        A.    No.
9        Q.    Do you think Semilla told Mary that?
10       A.    I don't know.
11       Q.    Were you in the room when Semilla told
12  Mary that?
13       A.    No.
14       Q.    Did Semilla ever say, "oh, I told Mary?"
15       A.    Yes.
16       Q.    Semilla told you that she told Mary that
17  she was pregnant?
18       A.    Correct.
19       Q.    When did she say that?
20       A.    I would assume the last week that I was
21  there.
22       Q.    Did she say how Mary responded?
23       A.    No, not that I recall.
24       Q.    Did Semilla -- do you know whether Semilla
25  ever told Mary that she was going to have an



AmersonWhite

COURT REPORTING & LITIGATION SUPPORT

866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

```
 1    abortion?
 2         A.    Yes.   She had to ask for time off.
 3         Q.    Do you know whether she asked for -- so
 4    two different things:   One is whether she asked for
 5    time off; and other is whether she said I'm going to
 6    have an abortion, right?
 7         A.    Right.
 8         Q.    So Semilla asked for time off.  Do you
 9    know whether she ever told Mary that she was taking
10    that time off to have an abortion?
11         A.    I don't know that.
12         Q.    Was Semilla still working there at the
13    time you left, the time you were terminated?
14         A.    She got fired a couple of days after me,
15    taken off the schedule, magically.
16         Q.    So you weren't there on Semilla's last day
17    of work?
18         A.    I might have been.  I mean, I don't
19    remember exactly when her last day was.  I know that
20    it was around the exact same time as mine, so...
21         Q.    Did you speak to Semilla about her last
22    day of work?
23         A.    No.
24         Q.    Have you spoken to Semilla since you were
25    fired?
```

